**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Crim. No. 10-159-1** |
| | : | |
| **OMELYAN BOTSVYNYUK** | : | |
| | : | |

**Diamond, J.**                                                                                                   **July 16, 2012**

<u>**MEMORANDUM**</u>

After a month-long trial, the jury convicted Defendant Omelyan Botsvynyuk of RICO Conspiracy and Hobbs Act Extortion. *(Doc. No. 155)*; 18 U.S.C. §§ 1951, 1962(d). The evidence established in overwhelming and horrifying detail how Defendant, his four brothers, and others trafficked in slaves, smuggling Ukrainian citizens into the United States and compelling their uncompensated labor by violence and threats. *(Doc. No. 1.)* The jury found Defendant personally liable for committing aggravated sexual assault in connection with the predicate crimes of peonage and involuntary servitude. *(Doc. No. 155.)*

Now, some eight months after trial, Defendant argues for the first time that his "Indictment must be dismissed" as time-barred. *(Doc. No. 223 at 2.)* I will deny Defendant's "Motion to Dismiss Indictment or Motion in Arrest of Judgment / Motion for Judgment of Acquittal." *(Doc. No. 223.)* Defendant has waived his belated statute of limitations defense, which, I conclude in the alternative, is meritless.

# I.    BACKGROUND

## A.    *Facts*

The trial evidence showed that the Botsvynyuk Organization—comprising Defendant, his four brothers, and loosely-confederated associates in Ukraine, Poland, Mexico, and the United States—recruited workers in Ukraine with the promise of a better life in the United States. The Organization focused its recruiting activities in Chernivtsi Oblast, an impoverished area in Ukraine. The victims—who were often related—had difficult lives, earning the equivalent of twenty to fifty American dollars a month, or running retail businesses whose meager profits were taken by criminals offering "protection." *(E.g. Doc. Nos. 175 at 5–6; 192 at 5; 193 at 61.)* The Organization promised to arrange for each victim's direct transportation and lawful admission to the United States, to house and feed him or her, and to pay each a monthly wage of $500. *(E.g. Doc. Nos. 192 at 9–12; 193 at 68–70.)* The Organization told the victims that for three years they would "work off" their "debt"—the cost of arranging their transportation to the United States, their food, and their housing. They would then be free to seek their own employment. *(E.g. Doc. Nos. 192 at 11; 193 at 70.)*

The Organization kept none of these promises. After leaving their homes in Ukraine, the victims learned that their passage to the United States would be neither direct nor lawful. Victims came to learn that the Organization had arranged for visas to Mexico, not the United States. *(E.g. Doc. No. 192 at 73:23–25.)* Typically, the Organization transported the victims by a similar, circuitous route: a bus to Kiev; a train to Chernobyl; a car to Poland; a flight to Germany or the Netherlands; and another flight to Mexico City, where each victim was instructed to bribe Mexican immigration officers. Once in Mexico, the victims travelled for some two hours by car to Mexicali or Tijuana, on the United States border. *(Doc. No. 175 at 8–*

*17.)*

With the assistance of the Organization's associates in Mexico, the victims entered the United States unlawfully, usually by walking across the border at a pedestrian checkpoint. *(Doc. No. 193 at 78–81; <u>see also</u> Doc. Nos. 175 at 15–16 (illegal entry by ship); 196 at 29–31 (illegal entry through sewers).)* The victims were instructed that if they were denied entry, to repeat the attempted crossing until successfully in the United States or detained by American immigration authorities. *(Doc. No. 193 at 78–81.)*

Many of the victims were detained, often for weeks in a California immigration facility. The Organization provided each detainee with an attorney, who instructed the detainee falsely to claim political asylum. *(E.g. Doc. No. 192 at 36–38, 41–42.)* The detainee eventually would be released pending an asylum hearing to take place in California several weeks later. *(E.g. <u>id.</u> at 38–39.)* Acting on instructions from the Organization, the detainee travelled, usually by bus, to Omelyan Botsvynyuk's row house in the Port Richmond section of Philadelphia—a three to five day journey. *(E.g. <u>id.</u> at 40–41.)*

Defendant, who was the leader of the Organization, set the tone for his relationship with his victims immediately upon their arrival. For instance, one victim testified that Defendant greeted her by yelling, "Well, about time you got here, bitch." *(Doc. No. 196 at 38:9; <u>see also, e.g.</u>, Doc. No. 175 at 20:23 ("Oh, so here you are dirty slut.").)* Defendant took the victims' passports and immigration papers, and prohibited them from attending their immigration hearings. *(E.g. Doc. No. 192 at 78.)*

Although exhausted from their perilous journeys, the victims promptly commenced work, often on the night they arrived or the next night. *(E.g. Doc. No. 192 at 51:8; 193 at 19–20; 202 at 10:17–20.)* Victims typically worked long overnight shifts, cleaning offices and stores (such

as Walmart), seven nights a week, with no holidays except Christmas.  *(E.g. Doc. Nos. 193 at 85–86, 90–91; 202 at 11:5–19.)*

Omelyan Botsvynyuk and his brothers Stepan, Yaroslav, and Mykhaylo all had separate residences in Port Richmond.  Each housed his own "crew" of workers.  *(E.g. Doc. Nos. 193 at 85–86; 196 at 40; 202 at 11, 51.)*  Their living conditions were, to put it kindly, Spartan.  For instance, Defendant made seven workers share one small bedroom.  *(Doc. No. 193 at 84–85.)*  Some workers slept in the hallways of Defendant's house.  *(Id. at 85; Doc. No. 202 at 12:9–10.)*  The victims slept on bare mattresses—two to a mattress.  *(E.g. Doc. No. 193 at 85.)*  Defendant kept fresh food in his own bedroom for his own consumption.  Only when it began to spoil did he provide the food to his "crew."  *(Doc. Nos. 172 at 45–46; 200 at 5.)*

The Organization did not pay the victims for their labor.  Defendant told one arriving worker that he would be paid only $300 a month.  When the victim asked why, Defendant struck him.  *(Doc. No. 192 at 46:11–19, 62–63.)*  In fact, the victim received no compensation for his labor.  *(Doc. No. 192 at 77.)*  The Organization gave the victims extremely limited funds for food and rent, but payments for the victims' labor went directly and exclusively to Defendant.  *(E.g. Doc. Nos. 192 at 57–58; 196 at 44–45, 48.)*  Although Defendant's "crew" usually worked in the Philadelphia area, all the "crews" often worked in other areas—Quakertown, Pennsylvania, Albany, New York, Oxon Hill, Maryland, and other cities.  *(Doc. Nos. 192 at 92; 193 at 109; 196 at 43, 46.)*

The Organization compelled the victims' labor through threats, violence, and dependence, creating a climate of pervasive fear.  The victims were in the United States illegally, spoke little or no English, had no passports or immigration papers, and little or no money.  Defendant warned them that if they went anywhere, police would arrest them.  *(E.g. Doc. Nos.*

*175 at 20:25–21:4; 176 at 16:15–20; 193 at 91:15–19.)*  The victims thus were initially afraid and unable to escape from the Organization.

Defendant and his brothers repeatedly abused and terrified their victims.  Because different "crews" often worked together, they discussed these abusive incidents, thus heightening the fear all the victims felt.  *(E.g. Doc. Nos. 172 at 43–44; 200 at 103.)*  Defendant continually berated his victims, calling the men "fagot" and the women "dirty slut" or "bitch."  *(Doc. No. 172 at 35:17–20.)*  Without reason, Defendant often grabbed the genitals of male workers, causing excruciating pain.  *(Doc. No. 196 at 52:8–11.)*  When two victims were fired from a cleaning job, Defendant and his brother Yaroslav castigated and beat them.  *(Doc. No. 192 at 66–69.)*

Some victims secretly held "side jobs," by which they earned money they would later use to try to escape from the Organization.  *(E.g. Doc. No. 196 at 44–45.)*  The initial results were mixed.  O.H. testified that she was terrified after Defendant and his brothers found a would-be escapee, beat him unconscious, doused him with water to wake him, then beat him unconscious again.  *(Doc. No. 196 at 53.)*  When the sisters of one victim escaped, Defendant and Stepan Botsvynyuk beat the victim continually over twenty-four hours in an unsuccessful effort to induce him to disclose his sisters' whereabouts.  *(Doc. No. 200 at 108–11.)*  The bruises and wounds that covered the victim's body were so severe that another victim wept when he first saw them.  *(Doc. No. 202 at 57–58.)*  After another victim attempted to escape, Omelyan and Stepan Botsvynyuk successfully hunted him and beat him severely, telling other victims that this was the consequence of escape.  *(Doc. Nos. 192 at 71; 193 at 113.)*

The Botsvynyuks also continually threatened their victims' families.  *(E.g. Doc. Nos. 192 at 76; 196 at 55; 200 at 104, 108–11.)*  As described below, Omelyan Botsvynyuk made these

threats to the families by telephone or face-to-face in Ukraine to control the victim-laborers in the United States and to extort money from them.

Omelyan Botsvynyuk visited the most horrific treatment upon his female victims. Shortly after M.S.1 arrived in Philadelphia, she was in the kitchen of Defendant's house when he suddenly entered and, screaming, seized her by the shoulders. She ran to the bathroom and locked the door. Defendant broke through the door, grabbed M.S.1 by the hair, dragged her from the bathroom, and, strewing patches of hair, threw her down a flight of stairs. *(Doc. No. 176 at 21–22.)* This caused M.S.1 to black out and left a bleeding bald spot on her scalp. *(Id. at 24.)*

Defendant raped M.S.1 on three separate occasions. First, while M.S.1 was sleeping, Omelyan Botsvynyuk woke her, held her head back, and forced cognac down her throat. When she tried to get away, he punched her in the stomach and pushed her onto a sofa. Tearing off her clothes, he screamed "bitch, prostitute, dirty slut," and raped her. *(Id. 176 at 25–27.)* Some time later, while M.S.1 was doing laundry, Defendant again seized her, taped her mouth shut, tied her hands behind her back, threw her to the floor, and raped her both vaginally and anally, causing her to bleed from her anus for some two months. *(Id. at 28–29.)* Finally, when M.S.1—who slept in the cellar of Defendant's house—was falling asleep, Defendant and two unknown men entered, taunted her, and gang-raped her. *(Id. at 30–31.)*

Omelyan Botsvynyuk did not permit M.S.1 to seek medical attention after any of these incidents. *(Id. at 24:23–25, 27:17–18, 29:20–23, 32:5–7.)*

Shortly after I.S. arrived in Philadelphia, she sat in Defendant's kitchen eating soup. Defendant repeatedly walked around her, touching her shoulders, saying "oh, I like," and "treating [her] as if [she] was this thing." *(Doc. No. 200 at 28–29.)* When I.S. ran to the bathroom, Defendant "ripped off the door to the bathroom," and screamed, "What do you think,

everything will be the way you want? Everything will be the way I say it." *(Id. at 29:9–13.)* Defendant told I.S.—whose sister worked for one of Defendant's brothers—that he would take her sister "to the house of prostitution." *(Id. at 30:4–7.)* I.S. was "crying hysterically." *(Id. at 30:2.)*

That night, Omelyan Botsvynyuk forced I.S. into his bed, saying, "you will sleep here." *(Id. at 34:13–15.)* He told her he wanted her to bear his child. *(Id. at 35:4–6.)* When she attempted to leave, Defendant repeatedly punched her face so that her "eyes were darkened." *(Id. at 35:9–16.)* When she screamed, he "shut [her] mouth with a pillow." *(Id. at 35:25.)* He tore off her clothes and raped her. *(Id. 35–36.)* Once Defendant had fallen asleep, I.S. snuck from his bedroom to sleep in the living room. As she fell asleep, Defendant again appeared, struck her, and dragged her by her hair back to his bed. *(Id. at 36:15–20.)* He did not allow her to seek medical attention for the injuries she had suffered during this attack. *(Id. at 37:8–11.)*

Most of the remaining victims escaped in 2002 and 2003, causing the Organization to cease its United States cleaning operations a short time later. *(E.g. Doc. Nos. 200 at 108:7–12; 202 at 62:21–23.)* Stepan remained in the United States—where he was arrested. Yaroslav and Mykhaylo eventually settled in Canada. Defendant's wife testified at trial that Omelyan continued to run a car sale business in the United States until 2006, when he sought to move it to Germany, where he was subsequently arrested. *(Doc. No. 208 at 12:5–11.)* Until at least 2007, Omelyan Botsvynyuk continued to contact victims' families in Ukraine, by telephone and in person, threatening them with violence or death if they or their victim-laborers (still hiding in the United States) did not pay the "debt" they owed the Organization. *(Doc. Nos. 195 at 9–11, 13; 203 at 24–26.)*

B.    _Investigation_

In 2004, a suspicious series of Western Union transmissions led investigators in Kiev and Warsaw to ask the FBI for information about Stepan Botsvynyuk, Yaroslav [Botsvynyuk] Churuk, and their associates in Philadelphia. (_Id._ at 31–32.) The FBI came to understand that this investigation was related to the information provided to the FBI and Immigration and Customs Enforcement by a Botsvynyuk victim in San Diego. (_Id._ at 32.)

Locating witnesses was slow and difficult. The FBI often had only first or last names of the Organization's victims. (_Id._ at 40:16–19.) Transliteration of Russian or Ukrainian names resulted in different spellings, and many witnesses used several different nicknames. (_Id._ at 39.) Some witnesses had no permanent residence, some had no immigration status, and some had been deported. (_Id._ at 39–40.) Many feared for their safety or that of their families. (_Id._ at 39:22–24.) Most were in the United States illegally and feared deportation to Ukraine, where they could face reprisals from the Organization.

Even after witnesses were located, interviewing them was difficult and time-consuming. It could take months for investigators to convince fearful individuals to provide any information. (_Id._ at 34:1–10.) This process was further complicated by the need for interpreters. (_Id._ at 33, 43, 46.)

C.    _Procedure_

The Grand Jury indicted Omelyan, Stepan, Mykhaylo, Yaroslav, and Dmytro Botsvynyuk on March 17, 2010. Four of the brothers were arrested on June 30, 2010: Stepan Botsvynyuk in the United States; Omelyan Botsvynyuk in Germany; Mykhaylo Botsvynyuk and Yaroslav [Botsvynyuk] Churuk in Canada. (_Doc. Nos. 23; 14 at 2._) After Germany extradited Omelyan

Botsvynyuk, the Government took him into custody on December 7, 2010. *(Doc. Nos. 44, 52.)* Mykhaylo Botsvynyuk and Yaroslav [Botsvynyuk] Churuk are presently awaiting extradition in Canada. Dmytro Botsvynyuk is a fugitive in Ukraine, which has no extradition treaty with the United States. *(Doc. Nos. 24 at 7; 88 at 2 n.2; 94; 106 at 2–3 n.1.)*

On August 5, 2010, I granted the Government's unopposed Motion for Complex Case Designation based, *inter alia*, on the lengthy period of the charged conduct, the extradition difficulties, and the need to secure testimony from foreign witnesses. *(Doc. No. 27.)* After a hearing on February 14, 2011, I granted Defendant's Motion to Continue trial. *(Doc. Nos. 68; 69.)*

Defendant repeatedly sought to delay and disrupt the proceedings through his obstreperous conduct, his refusal to work with Court-appointed counsel, and his dilatory suggestions that he would retain trial counsel. For instance, on February 17, 2011, Defendant's first court-appointed attorney submitted a Motion to Withdraw because Omelyan Botsvynyuk had "ceased cooperating with counsel," and because "the attorney client relationship [was] broken beyond repair." *(Doc. No. 72 at 2.)* After a hearing on February 22, 2011, I granted the Motion and appointed Howard Popper to represent Defendant. *(Doc. Nos. 75; 76; 91 at 1–2.)*

On August 10, 2010, I allowed Arkady Bukh (who was privately retained) to appear *pro hac vice* for Stepan Botsvynyuk. *(Doc. No. 30.)* On April 20, 2011, Mr. Bukh entered his appearance for Omelyan Botsvynyuk. *(Doc. No. 87.)* I held a hearing on May 20, 2011 to address the Government's contention that Mr. Bukh was burdened by a conflict of interest. *(Doc. No. 88.)* I was troubled that Mr. Bukh had discussed defense strategy with Stepan Botsvynyuk and, with that knowledge, now sought to represent codefendant Omelyan. *(Doc. No. 91 at 2)*; see <u>Wheat v. United States</u>, 486 U.S. 153, 159–60 (1988) ("[M]ultiple representation of

criminal defendants engenders special dangers of which a court must be aware."); <u>United States</u> <u>v. Moscony</u>, 927 F.2d 742, 749–50 (3d Cir. 1991) ("Usually, the various rights and duties of the attorney clash when a defendant seeks to waive his right to conflict-free representation in circumstances in which the counsel of his choice may have divided loyalties due to concurrent or prior representation of another client who is a co-defendant . . . .").

I sought unsuccessfully to determine whether Stepan or Omelyan Botsvynyuk objected to any potential conflict. I was not able to conduct a colloquy with either Defendant because each refused to answer my questions and repeatedly interrupted me, the interpreter, and each other, disrupting the proceedings. *(Doc. No. 91 at 2–3.)* Accordingly, I disqualified Mr. Bukh and directed Mr. Popper to continue his representation of Omelyan Botsvynyuk. *(Id. at 3.)*

During the final pretrial conference in this matter—five days before trial was to begin— Troy Archie indicated that Omelyan Botsvynyuk intended to retain him. Mr. Archie stated that he was prepared to advise his client to plead guilty, but would not do so unless I continued the trial so that Mr. Archie would have time to review the record and the extensive discovery materials provided by the Government. *(See Doc. No. 125.)* Mr. Archie was unable to explain how he could advise Defendant to plead guilty if Mr. Archie was unfamiliar with the record and the evidence the Government intended to introduce at trial. *(Doc. No. 124.)* I refused the continuance request.

Trial took place between September 13, 2011 and October 12, 2011, when I completed giving the jury its final instructions. Nine victim-witnesses as well as members of their families testified for the Government. Defendant testified on October 5th, vehemently denying his guilt. He suggested that his prosecution was the work of "thugs" in the Ukrainian Militia and his former neighbors and friends, who resented the success of his car import business and sought

American citizenship. *(Doc. No. 174 at 2–4.)* In his *pro se* sentencing submissions, Defendant repeats these discredited allegations. *(Doc. No. 224.)* On October 12th, the jury found Omelyan Botsvynyuk guilty of RICO Conspiracy and Hobbs Act Extortion, and Stepan Botsvynyuk guilty of RICO Conspiracy and not guilty of Hobbs Act Extortion. *(Doc. Nos. 155, 156.)*

After trial, I allowed Stepan Botsvynyuk's retained lawyer, Joshua Briskin, to withdraw after Stepan threatened him, and appointed Jeremy Ibrahim to represent Stepan. *(Doc. No. 169.)* When Omelyan Botsvynyuk subsequently retained new counsel, I allowed Mr. Popper to withdraw. *(Doc. Nos. 47, 182, 189.)*

## II.    DEFENDANT'S CONTENTIONS

Omelyan Botsvynyuk believes that the charges against him are time-barred. In Defendant's view, the only acts alleged or proven within the limitations period—Defendant's threats to victims in Ukraine—occurred outside the United States. Defendant argues that I may not consider those threats for limitations purposes because the RICO Conspiracy and Hobbs Act statutes do not have "extraterritorial effect." *(Doc. No. 223.)* Defendant thus argues that once these "extraterritorial" acts are excluded, his Indictment and prosecution are outside the limitations period. I do not agree. Although he has attempted to avoid a finding of waiver by suggesting that his argument is jurisdictional, it is not. Defendant asks me to dismiss because his Indictment and prosecution are time-barred, not because a fraction of his extortionate conduct is ostensibly beyond the reach of federal law. Defendant has plainly waived this statute of limitations defense which, in any event, is meritless.

III.    <u>LEGAL STANDARDS</u>

The statute of limitations is an affirmative defense that may be waived.  <u>United States v. Jake</u>, 281 F.3d 123, 129 (3d Cir. 2002) (reinstating conviction; sidebar discussion was insufficient to preserve statute of limitations defense).  "[W]here the defendant neither raised the statute of limitations as a defense before or at trial nor asked for any jury instructions on the defense, the defense is waived . . . ."  <u>Id.</u> (citing <u>United States v. Oliva</u>, 46 F.3d 320, 325 (3d Cir. 1995)).

A Rule 12 challenge to the indictment's sufficiency must be made before trial unless the defendant disputes the court's jurisdiction or raises the failure to state an offense.  Fed. R. Crim. P. 12(b)(3)(B).  A Rule 34 challenge to the indictment's sufficiency must be made within 14 days of conviction.  Fed. R. Crim. P. 34(b).  A motion for judgment of acquittal must be made within 14 days of the jury's verdict unless the defendant shows "excusable neglect."  Fed. R. Crim. P. 29(c)(1), 45(b)(1)(B).

The limitations period governing RICO Conspiracy and Hobbs Act Extortion is five years.  18 U.S.C. § 3282(a); <u>United States v. Lauderdale</u>, 142 F. App'x 25, 27–28 (3d Cir. 2005) (extortion); <u>Manna v. U.S. Dep't of Justice</u>, 51 F.3d 1158, 1168 n.1 (3d Cir. 1995) (RICO Conspiracy).  The limitations period begins to run only when the crime is complete.  For RICO Conspiracy, this does not occur "until the purposes of the conspiracy either have been accomplished or abandoned."  <u>Manna</u>, 1158 F.3d at 1168 n.1 (citing <u>United States v. Persico</u>, 832 F.2d 705, 713 (2d Cir. 1987)).  Unlike a substantive RICO charge (which requires the Government to prove at least one predicate offense within the limitations period), "once the government meets its burden of proof to establish a RICO Conspiracy, it is entitled to a presumption that the conspiracy continued until [the] defendant demonstrate[s] otherwise."

United States v. Yannotti, 541 F.3d 112, 123 (2d Cir. 2008); United States v. Saadey, 393 F.3d 669, 677–78 (6th Cir. 2005).

An indictment charging RICO Conspiracy satisfies the statute of limitations if the grand jury alleges that the conspiracy continued into the limitations period.  United States v. Coia, 719 F.2d 1120, 1124 (11th Cir. 1983); cf. Salinas v. United States, 522 U.S. 52, 63–64 (1997) (no overt act required for RICO Conspiracy); Fiswick v. United States, 329 U.S. 211, 216 (1946) (conspiracy requiring an overt act is deemed complete for limitations purposes at time of completion of the last overt act).  Conspiracy is a "continuing offense and a jury may consider each and all of a defendant's actions in furtherance of the conspiracy."  Jake, 281 F.3d at 129 n.6.  The jury may thus consider all acts in furtherance of the conspiracy, providing the conspiracy continued into the limitations period.

IV.    DISCUSSION

   A.    *Waiver*

Having failed to raise the statute of limitations defense before or during trial, Defendant has waived it.  See Oliva, 46 F.3d at 325.  Defendant's contentions respecting the insufficiency of the Indictment and the trial evidence are part of his statute of limitations defense and so fail because that defense is waived.

Even if I consider the insufficiency claims as independent contentions, they are nonetheless waived.  The time to challenge a defect in the Indictment or to move for a judgment of acquittal has long passed.  Defendant's Motion under Rule 12 was due before trial; his Motions under Rules 29 and 34 were due within 14 days of his conviction.  Fed. R. Crim. P. 12(b)(3)(B), 29(c)(1), 34(b).  Defendant has not even suggested excusable neglect or good cause

to excuse the waiver.  Fed. R. Crim. P. 12(e), 45(b)(1)(B).  Accordingly, I will deny his Motion.

*B.*     *Merits*

In the alternative, I conclude that Defendant's Motion is meritless.  Once again, Defendant contends that that the only acts alleged or proven within the five-year limitations period—Defendant's threats to victims in Ukraine—occurred outside the United States, and that these cannot be considered for limitations purposes because the charged offenses are based on statutes that have no extraterritorial effect.  Defendant ignores that as alleged and proven at trial, he began his extortionate activities in the United States and took the great bulk of those actions domestically to further a criminal enterprise based here.  To reinforce those domestic threats—and to further his domestic RICO enterprise—Defendant interspersed additional threats that he made by telephone and in person to victims' families in Ukraine.  He explicitly intended these threats to be communicated to the victims themselves in the United States, and they were, in fact, communicated to the victims.  Under abundant authority, all these threats taken together make up the offense of extortion.  They thus all come within the limitations period.

## Defendant's Threats Against T.P. and his Family

While in Philadelphia, Defendant repeatedly struck, beat, and threatened T.P., who escaped in early 2002.  *(Doc. No. 192 at 62–69.)*  Defendant promptly telephoned T.P.'s mother in Ukraine and told her that if T.P. did not return to Defendant's employ, she would never see her son alive.  *(Doc. No. 173 at 16:17–20.)*  In another call, Defendant told T.P.'s mother that her son was dead.  *(Doc. No. 173 at 21.)*  In yet another call to Ukraine, Defendant told T.P.'s mother that if she did not divulge T.P.'s location, Defendant would kidnap T.P.'s 13-year-old brother and send her one of the boy's fingers each day, that he would rape her in the presence of

her husband and young son, and that this would continue until she divulged T.P.'s whereabouts. *(Id. at 18.)* T.P.'s mother relayed to her son (still in the United States) that Defendant had called her and threatened T.P. *(Doc. No. 192 at 76–77.)*

## Defendant's Threats Against O.H. and her Family

In late 2002, O.H. escaped and then telephoned Defendant in Philadelphia, who told her that if she did not return, he would "go after [her] family" and "make them pay" for her "debt." *(Doc. No. 196 at 53.)* Defendant demanded that O.H. pay him $1,000 a month for two years. *(Id. at 57.)* When she did not return, Defendant phoned O.H.'s mother in Ukraine and told her that if O.H. did not come back, he would find O.H., beat her, and force her into prostitution to work off her "debt." *(Id. at 87.)* Defendant subsequently called O.H.'s mother several times a week—always in the middle of the night—threatening to kill her and her daughter if she did not pay O.H.'s "debt." *(Id. at 88–89.)* After her mother told O.H. (who was still in the United States) of Defendant's phone call, O.H. contacted Defendant and pleaded with him to stop threatening her family. *(Doc. No. 196 at 56–57.)*

## Defendant's Threats Against M.S.1 and her Family

While in the United States, from July 2001 to late 2002, Defendant repeatedly threatened M.S.1, compelling her to work six days a week cleaning stores, and one day a week cooking, cleaning, and doing laundry for Defendant himself. *(Doc. No. 176 at 8–9, 35:1–6.)* Defendant beat other workers in M.S.1's presence to keep her in a constant state of fear. *(Id. at 11–13, 14–15.)* As I have described, Defendant beat, raped, and sodomized M.S.1. *(Id. at 21–32.)* Defendant reminded her that she had "this little prostitute" in Ukraine—referring to her 9-year-old daughter. *(Id. at 13, 36:20–23.)*

Immediately after M.S.1 and her husband V.S. (also a victim of the Organization) escaped in late 2002, Defendant telephoned M.S.1's mother-in-law—who was caring for M.S.1's daughter in Ukraine—demanding M.S.1's return or the payment of M.S.1's "debt" to the Organization. Calling in the middle of the night, he said he would travel to Chernivtsi and that "blood will be pouring on you and your granddaughter." *(Doc. No. 195 at 5:18–23; see Doc. No. 176 at 17.)* Defendant called again two days later, and threatened to take M.S.1's daughter "to the whore house to work it off for her parents." *(Doc. No. 195 at 8:20–21.)* M.S.1's mother-in-law relayed these threats to M.S.1 and her husband in the United States. *(Id. at 8:3–6.)*

When M.S.1 neither returned nor paid off her "debt," Defendant continued to threaten M.S.1's family in Ukraine. In 2005, Defendant actually visited M.S.1's mother-in-law in Ukraine and told her that if she did not comply with his demands, her "granddaughter might not make it to school," or a car might run her over. *(Id. at 10–11.)* Some time later, Defendant again visited M.S.1's mother-in-law, shook her then-13-year-old granddaughter by the shoulder, and said she "will have to work off the money for [her] mom and dad," implying Defendant would force the granddaughter into prostitution. *(Id. at 11; Doc. No. 203 at 25:5–13.)* M.S.1's mother-in-law was terrified, and for years would not allow her granddaughter to leave the house unescorted. *(Doc. No. 195 at 10:16–21.)*

In 2007, Defendant again confronted M.S.1's mother-in-law in Ukraine. Again referring to the "debt" M.S.1 and V.S. owed to the Organization, Defendant said that her son V.S. "is healthy," and reminded her that if she "want[s] him to stay healthy," she "would have to work it out" with him. *(Doc. No. 195 at 13.)* Once again, Defendant obviously intended the mother-in-law to communicate this threat to M.S.1 and V.S., who were still in the United States. *(Doc. No. 176 at 35–37.)*

## Repeated Threats Comprise a Single Extortionate Episode

These many threats—those made face-to-face or by telephone; those made here or in Ukraine—are obviously of a piece. The "unit of prosecution" for extortion is not an individual threat, but the whole extortionate scheme. <u>United States v. Provenzano</u>, 334 F.2d 678, 685 (3d Cir. 1964). The <u>Provenzano</u> Court held that even though the defendant's threats were made outside the limitations period, the prosecution was timely because the resulting payments from the victim took place less than five years before the indictment. A series of ongoing, extorted payments extending into the statutory period rendered the defendant liable for the whole scheme, although he was indicted more than five years after making his last threat. <u>Id.</u> at 684–85; <u>see also</u> <u>United States v. Smith</u>, 198 F.3d 377, 384 (2d Cir. 1999) (Hobbs Act Extortion is "continuing offense" for venue purposes: "a single extortionate act committed within the statute of limitations period was sufficient to make defendant liable for all acts comprising the single scheme."); <u>United States v. Bucci</u>, 839 F.2d 825, 830 (1st Cir. 1988) (Hobbs Act Extortion timely where the only occurrence within limitations period was a single payment (citing <u>Provenzano</u>, 334 F.2d at 685)).

RICO Conspiracy—which includes extortion as a predicate racketeering activity—is also a continuing offense for limitations purposes. <u>United States v. Pungitore</u>, 910 F.2d 1084, 1129 n.63 (3d Cir. 1990). Accordingly, because Defendant's threats extended into the limitations period, he is liable for the entire extortionate scheme and the RICO Conspiracy it furthered.

## Foreign Conduct Intended to Have a Domestic Effect

Defendant argues that the 2005 and 2007 threats he made in Ukraine are not cognizable criminal acts for limitations purposes because they were made outside the United States.

Defendant has ignored the record and misread the law.

The Supreme Court has held that criminal statutes generally do not have "extraterritorial effect." See United States v. Flores, 289 U.S. 137, 155 (1933); cf. Morrison v. Nat'l Austl. Bank Ltd., 130 S. Ct. 2869, 2877 (2010) (noting canon of construction against extraterritorial effect of civil statutes). Courts have uniformly held, however, that Congress may impose criminal penalties on foreign behavior that is intended to have an effect within the United States. The Third Circuit has suggested that the Hobbs Act Extortion statute would apply to conduct that was entirely extraterritorial because it had a sufficient domestic nexus. United States v. Inigo, 925 F.2d 641, 648–49 (3d Cir. 1991). In upholding the defendants' convictions, the Court rejected the suggestion that the Act could not reach foreign extortionate conduct:

> Even if none of the parties' overt acts had occurred in this country, as indeed is the case with [these defendants], Congress could give the district court jurisdiction under the commerce clause so long as their activities affected [the victim's] commercial ventures in interstate commerce within the United States.

Id. at 648; see United States v. Ivanov, 175 F. Supp. 2d 367, 373–74 (D. Conn. 2001) (Hobbs Act Extortion applied extraterritorially to defendant, acting in Russia, who compromised the victim's computer systems in the United States and demanded money in emails sent to the United States) (citing Inigo, 925 F.2d at 648).

Courts have similarly held that Criminal RICO provisions apply to racketeering actions taken abroad in furtherance of a domestic criminal enterprise. For instance, in United States v. Phillip Morris USA Inc., the D.C. Circuit rejected the argument that the defendant's foreign activities were beyond the reach of the RICO statute:

> Because conduct with substantial domestic effects implicates a state's legitimate interest in protecting its citizens within its borders, Congress's

> regulation of foreign conduct meeting this "effects" test is "not an
> extraterritorial assertion of jurisdiction."

United States v. Phillip Morris USA Inc., 566 F.3d 1095, 1130 (D.C. Cir. 2009) (emphasis in

original) (citing Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 923 (D.C.

Cir. 1984)); cf. United States v. Leija-Sanchez, 602 F.3d 797 800 (7th Cir. 2010) (18 U.S.C. §

1959, which prohibits violent crimes in furtherance of racketeering activity, applied to a murder

committed in Mexico and ordered by the defendant in the United States in furtherance of a

domestic criminal enterprise).

Defendant acknowledges the uniform and repeated holdings that federal criminal laws are

not applied extraterritorially when they are used to penalize foreign acts that "produce effects or

are intended to produce effects in this country." *(Doc. No. 223 at 5 (citing United States v.*

*Noriega, 746 F. Supp. 1506, 1517 (S.D. Fla. 1990)))*; see United States v. MacAllister, 160 F.3d

1304, 1308 (11th Cir. 1998) (per curiam); United States v. Noriega, 117 F.3d 1206 (11th Cir.

1997); United States v. Vasques-Velasco, 15 F.3d 833, 839 n.4 (9th Cir. 1994); Brulay v. United

States, 383 F.2d 345, 350 (9th Cir. 1967). Remarkably, Defendant argues that these cases are

inapposite because there is "no nexus in the instant case between Defendant's conduct and the

United States." *(Doc. No. 223 at 5.)* Rather, "[a]ny actions by defendant Omelyan Botsvynyuk

in the Ukraine between 2005–2007 were isolated acts over which the United States Courts have

no jurisdiction." *(Doc. No. 228 at 4–5.)* This is absurd. As I have described, from 2002 through

2007, Defendant continually abused and threatened his laborer-victims and threatened their

families by telephone or face-to-face. The bulk of this extortionate conduct was domestic.

Defendant's extortionate activities in Ukraine, whether in 2003, 2005, or 2007, were all intended

to have a substantial effect in the United States: to reinforce the multitude of threats he made to

compel his victims to pay off their "debts," and otherwise to support Defendant's domestic

criminal enterprise. Indeed, as I have described, these threats were conveyed to the victims, who were then in hiding in the United States. Defendant's suggestion that his 2005 and 2007 extortionate actions were "isolated" and had "no nexus" to the United States is thus a misstatement of the trial evidence, which showed just the opposite. Because Defendant's extortionate conduct in Ukraine had a considerable "domestic nexus," that conduct is cognizable under the RICO Conspiracy and Hobbs Act statutes. Because the conduct took place within the five year limitations period, Defendant's 2010 Indictment is timely.

## The RICO Conspiracy Charge is Presumptively Timely

Finally, once the Government establishes the existence of a RICO Conspiracy, it is presumed to continue until the defendant demonstrates that it was accomplished or abandoned, or that defendant withdrew. Yannotti, 541 F.3d at 123; see Saadey, 393 F.3d at 677–78 (RICO Conspiracy indictment sufficient without inclusion of a predicate offense within the limitations period). Defendant does not suggest that the Government failed to establish the existence of a conspiracy. Nor has Defendant shown that the conspiracy was accomplished, abandoned, or that he withdrew before 2005. Yannotti, 541 F.3d at 123; Saadey, 393 F.3d at 677–78. On the contrary, Defendant's 2005 and 2007 threats to family members to pay the victims' debt to the Organization confirm that the conspiracy continued with Defendant's active participation. Accordingly, Defendant has failed to show that his prosecution for RICO Conspiracy is time-barred.

V.    <u>CONCLUSION</u>

I will deny Defendant's Motion because: (1) the Motion is untimely; and (2) Defendant has waived the statute of limitations defense.  I conclude in the alternative that Defendant's Motion is meritless.

An appropriate Order follows.

**AND IT IS SO ORDERED.**

/s/ Paul S. Diamond
_____
Paul S. Diamond, J.